HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

*Attorneys for Plaintiff Concerned
Citizens of the Haight*

# UNITED STATES DISTRICT COURT FOR

# THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CONCERNED CITIZENS OF THE HAIGHT**, a California unincorporated nonprofit association,<br><br>              Plaintiff,<br><br>              v.<br><br>**CITY AND COUNTY OF SAN FRANCISCO**, a municipal entity,<br><br>              Defendant. | Case No.:  3:20-cv-03538<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff Concerned Citizens of the Haight ("Concerned Citizens"), on behalf of its members and through its attorneys, Dhillon Law Group, Inc., brings this action against the above-named Defendant City and County of San Francisco (the "City") for declaratory and injunctive relief, prohibiting the City from establishing or maintaining a homeless encampment at 730 Stanyan Street in San Francisco, California, as follows:

## NATURE OF ACTION

1.      730 Stanyan Street, located in the heart of San Francisco's Haight-Ashbury neighborhood and in the middle of a densely-populated residential and business district, has had a troublesome past. Formerly a McDonald's restaurant, it was a mecca for transients and drug dealers, resulting in the attendant loitering, drugs, and violent crime that blighted the surrounding communities and jeopardized the safety and well-being of Haight Street's residents and merchants for many years. In 2014 and 2015, the site generated an average of 2 police calls every day. In 2015, City Attorney Dennis Herrera declared the site a public nuisance, and in April 2018, the City purchased the building/lot for $15.5 million, with plans to address the rampant crime and safety concerns.

2.      From 2015 to present, the Haight Street community, alongside the City, fought valiantly to ameliorate the condition of 730 Stanyan Street. And eventually, they accomplished their goal: today, 730 Stanyan Street is a paved, vacant lot that does not pose health, safety, or well-being concerns for the surrounding neighborhood.

3.      Despite this monumental accomplishment, the City now plans to disrupt the *status quo* that it was instrumental in creating, by moving a homeless encampment onto the 730 Stanyan Street lot. The City is obviously aware of the susceptibility of this area to crime and drug use. The City also knows that 730 Stanyan Street abuts a residential neighborhood; is within 10 feet of a public bus-stop; is across the street from the area's largest grocery store (with lines stretching to the sidewalk during the COVID19 pandemic), the entrance to Golden Gate Park (with attendance numbers highly increased during shelter in place), beloved local merchants, summer camps for children, a skate park, and two childcare facilities (including a daycare for essential workers and a preschool on Waller Street); and is in the immediate vicinity of a high school and housing for the elderly – in short, in the

middle of a group of citizens of all ages and types, who will be irreparably harmed by the imminent crime and disease that is amply foreseeable as a result of this change.

4.      To exacerbate the situation, this change comes in the midst of a national health pandemic. Though the City recognizes that COVID19 is easily transmitted among people in close quarters, and requires sufficient sanitation measures to stem the tide of infection, the City has decided to congregate 40 to 60 tents and an unknown number of individuals in the 730 Stanyan Street lot, without working toilets; indeed, the City intends to merely outfit the lot with Port-a-Potties, with no indication of how frequently they will be emptied, cleaned or sanitized. As such, campers will be unable to follow CDC or City guidelines regarding preventing the transmission COVID19. Accordingly, and through no fault of their own, they will be rendered a health risk to one another, as well as to the surrounding community. The City made this decision despite several alternatives that are many times larger than the 730 Stanyan Street lot and/or provide more resources to campers and/or are owned by the City's Recreation and Parks department.

5.      Plaintiff Concerned Citizens of the Haight ("Concerned Citizens") is a non-profit association of residents, merchants, and property owners in neighborhoods surrounding 730 Stanyan Street, which seeks an injunction against the opening of the homeless encampment at 730 Stanyan Street, for the good of the campers, the neighborhoods, and all citizens of San Francisco. Concerned Citizens seeks to compel the City to comply with its obligations under the law, to ensure the hard-won *status quo* whereby 730 Stanyan Street is a peaceful part of a neighborhood instead of a mecca for crime, drugs, and violence, and to protect the health, safety, financial integrity, and general well-being of the Haight Street community and of the campers who will soon be subject to unsafe living conditions, should injunctive relief not issue.

## JURISDICTION AND VENUE

6.      This action arises under 42 U.S.C. § 1983 in relation to Defendant's deprivation of Plaintiff's members' constitutional rights to due process under the Fourteenth Amendment to the U.S. Constitution. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs

under 42 U.S.C. § 1988. This Court has supplemental jurisdiction of all related claims asserted under state law pursuant to 28 U.S.C. § 1367(a).

7.     The Northern District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which Defendant maintains offices, exercises its authority in its official capacities, and will or have carried out the conduct alleged herein; it is also the District in which substantially all of the events giving rise to the claims occurred.

8.     This Court has personal jurisdiction over the Defendant, because the Defendant is domiciled in the State of California, has sufficient minimum contacts with California, and/or otherwise has intentionally availed itself of significant benefits provided by the State of California, rendering the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

## INTRADISTRICT ASSIGNMENT

9.     This Action is properly assigned to the San Francisco Divisions of the Court, as the conduct giving rise to this dispute occurred in San Francisco County, California. *See* Local Rule 3-2(d).

## PARTIES

10.     Plaintiff Concerned Citizens of the Haight is an unincorporated nonprofit association of residents, property owners, and merchants in the Haight-Ashbury neighborhood. It was established in 2020 and seeks to maintain the health, safety, and commercial integrity of the Haight-Ashbury neighborhood for the benefit of neighbors, businesses, and customers, and the surrounding community.

11.     Concerned Citizens of the Haight satisfies all associational standing requirements. Its members have standing to sue in his, her, and/or their own right; the interests sought to be vindicated by this action are germane to the association's purpose; and neither the claims asserted nor the relief requested require the participation of individual members in the lawsuit.

12.     Defendant City and County of San Francisco ("Defendant" or the "City") is a municipal entity existing under the laws of the State of California, with the capacity to sue and be sued.

## FACTUAL ALLEGATIONS

### Haight-Ashbury and the Commercial Corridors

13.     The iconic district of Haight-Ashbury is a San Francisco district that generally encompasses the neighborhoods surrounding Haight Street, bounded by Stanyan Street and Golden Gate Park on the west, Oak Street and Golden Gate Park Panhandle on the north, Divisidero and Buena Vista Park to the east, and Frederick Street and Ashbury Heights and Cole Valley neighborhoods to the south.

14.     Haight-Ashbury is home to a diverse group of residents and merchants of all ages, ethnicities, physical abilities, and cultural backgrounds.

15.     While in most blocks, Haight-Ashbury is primarily residential, there are two active neighborhood shopping areas: one on Haight Street between Stanyan Street/Golden Gate Park and Masonic Avenue, and a second on Stanyan Street between Page Street and Frederick Street (collectively, the "Commercial Corridors"). Both of these corridors are anchored by the 730 Stanyan Street lot. The Commercial Corridors are densely populated and heavily trafficked, lined as they are with residences that are perched above ground floor storefronts of all types, from coffee shops, restaurants, hotels, bars and breweries, to venues for live performances, music shops, and many other establishments. The Commercial Corridors draw regular customers and heavy foot traffic, year round.

16.     Due in part to the Haight's legendary history as the birthplace of the hippie counterculture of the 1960s, the Commercial Corridors are also heavily visited by tourists from around the world, and constitute one of the most popular tourist destinations in the City.

17.     In light of their large volume of residents, merchants, workers, customers, and tourists, the Commercial Corridors community is densely populated year-round.

### 730 Stanyan Street

18.     At the apex of the Commercial Corridors is 730 Stanyan Street, which sits directly across Stanyan Street from the eastern entrance to Golden Gate Park. According to the City's Assessor, 730 Stanyan Street is approximately 137.5 feet by 275 feet, or approximately 37,813 square feet.

19.     730 Stanyan Street was the former site of a McDonald's restaurant, and was a long-time sore spot for the neighborhood, as it drew transients and drug dealers, and the accompanying frequent police visits for loitering, drugs, and violent crime. Residents and businesses complained for

years about the illegal activity at this location, and McDonald's was the site of hundreds of police calls each year – 640 alone between January 2014 and April 2015.[1]

20.     The dangers posed by 730 Stanyan Street were particularly critical, as not only does it anchor the Commercial Corridors, but it also abuts a residential neighborhood; is within 10 feet of a public bus-stop; is across the street from the area's largest grocery store, Whole Foods Market (with lines stretching to the sidewalk during the pandemic)[2], the entrance to Golden Gate Park (with attendance numbers highly increased during shelter in place), beloved local merchants, summer camps for children, a skate park, and two childcare facilities (including a daycare for essential workers and a preschool on Waller Street); and is in the immediate vicinity of a high school and housing for the elderly.

21.     The situation at 730 Stanyan Street deteriorated to the point that in 2015, City Attorney Dennis Herrera declared the McDonald's restaurant a public nuisance and issued its operators a cleanup order. In declaring the site a nuisance, Mr. Herrera stated that: "730 Stanyan Street is located in San Francisco's historic Haight-Ashbury neighborhood.  The surrounding neighborhood includes San Francisco's largest public park, a local children's playground, housing for senior citizens, and at least eight schools or daycare centers within half of a mile." Mr. Herrera further noted that pursuant to the California Health and Safety Code Section 11570 *et seq.* (the Drug Abatement Act): "every building or place used for the purpose of unlawfully selling, serving, storing, keeping, manufacturing or giving away any controlled substance … ***and every building or place wherein or upon which those acts take place***, is a nuisance which shall be enjoined, abated, and prevented, and for which damages may be recovered …"[3] (Emphasis added).

---

[1] *See, e.g.,* https://www.sfchronicle.com/bayarea/article/SF-to-open-sanctioned-tent-camp-on-old-15273859.php.
[2] *See id.*
[3] *See* https://www.slideshare.net/sfcityattorney/sf-vmc-donaldsdemandandcomplaint.

22.      The City bought 730 Stanyan Street in April 2018, and renovation of the area began last summer. 730 Stanyan Street and some of its surrounding environs is depicted in the following graphic:



23.      In light of the improvements to the site, local residents and merchants became cautiously optimistic that the threats that 730 Stanyan Street had long posed to their community were on the path to full amelioration. Indeed, the City's public records reflect 595 police reports in 2014, compared with 388 police reports in 2019.

**The Proposed "Safe Sleeping Village" at 730 Stanyan Street**

24.      On May 15, 2020, San Francisco Mayor London Breed announced on Twitter that the City would be opening a "Safe Sleeping Village" at 730 Stanyan Street, by "moving 40 tents" occupied by unhoused people within the City, to this vacant lot.[4] (Individuals who would potentially

---

[4] *See* https://twitter.com/LondonBreed/status/1261333387131842560.

inhabit 730 Stanyan Street, or are inhabiting 730 Stanyan Street at the time this Complaint is filed, are referred to herein as "Campers.")

25.    On information and belief, at the time this Complaint is filed, 730 Stanyan Street has no running water, plumbing, working toilets, or showers.

26.    On information and belief, the City does not intend to install working toilets, and instead intends to outfit the camp with Port-a-Potties, with no indication of how often they would be emptied, cleaned, and/or sanitized.

27.    According to Mary Ellen Carroll, executive director of the City's Department of Emergency Management, 730 Stanyan Street will provide enough space for 40 tents.[5]  However, it is unclear from the City's announcements whether the allotted space for "40 tents" will be limited to 40 individual Campers, or whether each tent will be allowed to house multiple Campers. Further, recent public sources indicate that up to 60 tents will be included.[6]

28.    A conservative estimate that presumes a maximum of 40 individual Campers means that there will be 40 people living in a 37,000 square foot vacant lot, without working toilets, and potentially without other utilities sufficient to allow proper sanitation. The actual number of individual Campers is likely to be much higher.

29.    Defendant City has ratified the conduct of Mayor Breed discussed herein, regarding the opening of the Safe Sleeping Village at 730 Stanyan Street.

**The Imminent Health and Safety Dangers and Economic Blight**

**Threatened by the Proposed "Safe Sleeping Village"**

30.    As discussed above, 730 Stanyan Street is located in the heart of a densely-populated community and retail district. It abuts Waller Street, a residential neighborhood street, and anchors the Commercial Corridor. It is situated in a high-foot traffic area, the use of which residents depend on, including to access their largest local grocery store (Whole Foods Market, located at 690 Stanyan/1878 Haight Street) as well as Golden Gate Park.

---

[5] *See, e.g.,* https://www.sfchronicle.com/bayarea/article/SF-to-open-sanctioned-tent-camp-on-old-15273859.php.

[6] *See, e.g.,* https://hoodline.com/2020/05/city-pushes-forward-to-identify-park-lands-for-future-homeless-tent-villages.

31.     In the immediate vicinity of 730 Stanyan Street are individual residences, an apartment complex, a high school, day care centers, housing for the elderly, open space and parks for children, storefronts, and Whole Foods Market, among other things.

32.     Community members living and working near 730 Stanyan Street include individuals who are highly vulnerable to COVID19, including the elderly and the immunocompromised. These individuals must periodically leave their residences and traverse the streets bordering 730 Stanyan Street, in order to obtain goods and services that are critical to their health and well-being, including groceries and trips to the doctor.

33.     There is a bus-stop on Stanyan Street, less than 10 feet from 730 Stanyan Street. Many members of the community must wait at this bus-stop and take the bus in order to travel to doctor's appointments, run essential errands, or travel to their place of employment.

34.     The location of the Safe Sleeping Village poses significant risks of transmission of COVID19, both among its Campers and to the surrounding neighborhood.

35.     At the time this Complaint is filed, it is unknown whether Campers will have access to running water, sinks, and showers. If running water is not provided, Campers will be unable to follow CDC guidelines regarding the prevention of COVID19, including the recommendation to wash hands with soap and water for at least 20 seconds and as often as possible.[7]

36.     Instead of toilets, Campers will use Port-a-Potties that, on information and belief, will not be emptied, sterilized and/or sanitized with sufficient regularity to prevent against surface and airborne fecal particulate matter.

37.     According to medical sources, congregate living situations can increase the risk of disease transmission. In particular, communally shared, enclosed portable toilets can pose a significant risk for increased transmission of COVID19, in light of its ability to be transmitted via respiratory, fecal, and surface contact exposures.[8]

38.     Given the small square footage of 730 Stanyan and the large number of Campers (at least 40 individuals, if not many more), on information and belief, it will not be possible for the

---

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.
[8] *See, e.g.* https://www.health.com/condition/infectious-diseases/coronavirus-fecal-transmission; https://www.newswise.com/coronavirus/can-COVID19-spread-through-fecal-matter/?article_id=731608; https://www.sciencedaily.com/releases/2020/05/200514131710.htm.

Campers to follow CDC guidelines regarding social distancing. Specifically, due to size restrictions of the "Safe Sleeping Village," Campers will be unable to stay at least 6 feet away from other people, and/or to avoid gathering in groups, and/or to isolate from other people if they are feeling ill.[9]

39.     As such, Campers will be at extremely high risk of contracting COVID19. Campers will also be at extremely high risk of transmitting COVID19, both among themselves and to members of the local community.

40.     According to the City, Campers will not be permitted to invite guests inside the "Safe Sleeping Village." As such, it is highly likely that Campers will congregate immediately outside 730 Stanyan Street and in the surrounding environs, if they choose to socialize or to engage in other activities, including drug dealing and use.

41.     Based on 730 Stanyan Street's recent history of loitering, drug use and crime, it is highly likely that the opening of the "Safe Sleeping Village" will be immediately followed by a resurgence of this activity. Indeed, the same types of health and safety dangers are currently taking place in San Francisco's Tenderloin neighborhood, where the City opened its first "Safe Sleeping Village." *See, e.g. Hastings College of the Law v. City and County of San Francisco,* Case No. 3:20-cv-03033-JST (N.D.C.A. May 4, 2020) (describing how the City's failure to address homelessness in the Tenderloin has led to, *inter alia,* "[o]pen-air drug sales and other criminal activity," "crowds of drug users," and sidewalks that are rendered "unsanitary, unsafe, and often impassable.").

42.     Drug use in and around 730 Stanyan Street would be particularly worrisome, given that it is within 600 feet of a day care center and is a short distance from a high school. *See, e.g.,* 16 Cal. Code Regs. §5026(a) (prohibiting cannabis sales within a 600-foot radius of "a school providing instruction in kindergarten or any grades 1 through 12, day care center, or youth center that is in existence at the time the license is issued"); San Francisco Planning Code Sec. 202.2(a)(5)(B) (same).

43.     The City has long acknowledged the susceptibility of the Haight Street community to public health and safety threats posed by large tent encampments. Prior to the onset of the pandemic, the City's Healthy Streets Operations Center ("HSOC") team listed the following as a reason for *not* allowing large tent encampments: "Increase in public health and public safety concerns in and around the encampment."

---

[9] See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/homelessness.html.

44.     Indeed, similar concerns formed the basis for City Attorney Dennis Herrera's decision to declare the McDonald's site a public nuisance in 2015, and for the City's decision to purchase 730 Stanyan Street a few years later, with plans to improve the area.[10]

45.      Now – after 5 years' worth of monumental efforts by both the City and the surrounding community to rid 730 Stanyan Street of crime and drug use – the City intentionally ignores these critical concerns, in the midst of a health pandemic that only exacerbates them. In fact, the City leans on the health pandemic as justification for its reversal of a *status quo* that has been so hard-won.

46.     In fact, the City openly acknowledges that the Safe Sleeping Village will not comply with CDC recommendations for health and safety. In the same breath as she announced the Safe Sleeping Village at 730 Stanyan Street, Mayor Breed conceded that "settings like shelters are now easy targets for this virus," and "[t]he largest outbreak in SF was in a shelter."[11] Though imperfect, shelters at least provide many resources that the Safe Sleeping Village will not (such as working toilets) or may not (such as running water, sinks, and/or showers).

47.     Mayor Breed concedes that the City's decision to open the Safe Sleeping Village is not a product of thoughtful decision-making that addresses the critical requirements of a national health pandemic; rather, Mayor Breed justifies the Safe Sleeping Village by stating that it is "better than unsanctioned encampments"[12] – a proposition that is contradicted by the CDC's own guidelines regarding the importance of social distancing and proper hygiene and sanitation.

48.     City Supervisor Dean Preston similarly concedes that there were "prefer[able]" sites to 730 Stanyan, but that the City is "not going to let the perfect be the enemy of the good here."[13]

49.     Indeed, there are several, more preferable locations for the Safe Sleeping Village that would not pose the dire health and safety threats that will arise from the use of 730 Stanyan Street. Prior to the City's announcement of the Safe Sleeping Village, Haight Street residents pled with Mr. Preston's office to use one of several sites that are much larger than 730 Stanyan Street, provide more resources and/or sanitation options (including, in some cases, plumbing), are currently vacant, and are

---

[10] *See, e.g.,* https://www.sfchronicle.com/bayarea/article/Be-not-afraid-of-Golden-Gate-Park-s-Stanyan-13852182.php.

[11] *See* https://twitter.com/LondonBreed/status/1261333387131842560.

[12] *See id.*

[13] *See* https://www.sfchronicle.com/bayarea/article/SF-to-open-sanctioned-tent-camp-on-old-15273859.php.

not located in the middle of a busy residential and business area (one that the City and community has spent decades trying to ameliorate). On information and belief, such alternatives include:

    a.    parking lots owned by the school district;

    b.    parking lots owned by the City College;

    c.    John Adams School;[14]

    d.    Recreation and Parks Department property (including Golden Gate Park)[15];

    e.    Kezar Stadium;[16]

    f.    Kezar Pavilion;

    g.    Existing, vacant hotel rooms.

50.    The City rejected these alternatives, in some instances because their use for other purposes is generating money for the city.[17]

## City Ignores Concerned Citizens' Pleas

## For A More Thoughtful Solution

51.    On Sunday May 17, a CCOH member sent Mayor Breed a letter regarding the proposed Safe Sleeping Village at 730 Stanyan Street. The letter applauded the City for its desire to help the homeless shelter in place, but voiced strong disagreement with the opening of 730 Stanyan Street for that purpose, for the reasons discussed in this Complaint.

52.    The letter described the community's grave health and safety concerns, noting that "sheltering all these people together seems counterintuitive to what we know about this virus. This is a concern to everyone in the area."

---

[14] According to the City's Assessor, this site is approximately104,844 square feet, or a little over 2 acres.

[15] Indeed, according to the City's Recreation and Parks department, the City has: 4,133 acres of recreational and open space, including 3,400 acres within San Francisco; 220 neighborhood parks; 179 playgrounds and play areas; 82 recreation centers and clubhouses; 59 soccer/playfields; and 1 family camp, *see* https://sfrecpark.org/419/Who-We-Are; *see also* https://www.kqed.org/quest/62076/transforming-san-francisco-into-a-model-of-disaster-preparedness (discussing viability of using San Francisco's public parks as alternatives during the pandemic); https://hoodline.com/2020/05/city-pushes-forward-to-identify-park-lands-for-future-homeless-tent-villages (City pushes forward to identify park lands for future "safe sleeping sites").

[16] On information and belief, the Kezar Stadium lot is over 100,000 square feet.

[17] *See* https://www.sfchronicle.com/bayarea/article/SF-to-open-sanctioned-tent-camp-on-old-15273859.php.

53.     The letter described the irreparable business harm that would result from the Safe Sleeping Village, noting that "the merchants on Haight Street have been on the front lines dealing every day with the collateral issues of the homeless, people who unfortunately often have drug, alcohol, and/or mental [health] issues. Establishing the Safe Camp next to us multiplies the problems tenfold. Customers who are already reluctant to 'Shop the Haight' will now have a much more serious barrier. Parents will be reticent to bring their kids to the area…[w]e deserve to have a fighting chance when we reopen, but the City is throwing a major obstacle in our way. Please give us a chance to survive by establishing the Safe Camp in a different location."

54.     The letter also noted due process concerns with the City's hurried and unilateral action, which will undo years of negotiations and work regarding the blighted 730 Stanyan Street property: "[a]nother issue is that this deal was made quickly and unilaterally, seemingly in the dead of night by the EOC, with no notification or public comment.  It was made in spite of years of neighborhood meetings and negotiations with the city regarding the interim use of 730 Stanyan."

55.     The City did not meaningfully respond to these concerns, and moved forward with its announcement to open the Safe Sleeping Village at 730 Stanyan Street.

56.     Other CCOH members have made similar pleas that the City not open the Safe Sleeping Village. On May 21, 2020, a CCOH member who is part of the ownership of the Whole Foods Market across from 730 Stanyan Street sent to Mayor Breed and the Department of Public Health a letter that expressed similar concerns and posed the following critical questions to the City:

"How many tents will be allowed? How many occupants? I understand that no one will be forced to move to the site, but when those who do move there, will they have to stay there (SIP)?  Or are they free to move up and down the street and co-mingle with others who are trying to obey by the SIP orders? What is the plan to monitor the health of the occupants?  Of the service providers?  If an outbreak occurs, what is the City's plan to contain it? What is the City's plan if this becomes a petri dish of COVID19?  Will the gates around the site be closed? Will people be prevented from leaving?  If this does become a "hot spot" of COVID19, and if the occupants are not quarantined, what will happen to the rest of the neighborhood? What will the City to do if this camp gets into Whole Foods and infects more of the workers there?  Does the City have a plan if Whole Foods – the largest grocery in the area – the historic site of our largest grocery store for the past 70 years, has to close its door?

57.     A day prior, on May 20, 2020, this member also sent a letter to City Attorney Dennis Herrera, voicing strong opposition to the 730 Stanyan Street encampment and pointing out Mr. Herrera's hypocrisy in introducing the same threats to the area that Mr. Herrera had determined constituted a public nuisance in 2015.

58.     The City has not responded to these letters, and intends to move forward with opening 730 Stanyan Street as a homeless encampment in the immediate future.

59.     In addition, neighbors in the Upper Haight and District 5 have recently organized to form Safe Healthy Haight, to represent similar concerns of residents regarding the City's reckless use of the 730 Stanyan Street lot. *See* https://medium.com/@safehealthyhaight/establishing-safe-healthy-haight-684ac549f01a.

60.     On information and belief, the City has not responded to the legitimate concerns raised by countless residents of the Haight-Ashbury neighborhood.

**730 Stanyan Street is Not Zoned for a Homeless Camp**

61.     730 Stanyan Street is located in the Haight Street Neighborhood Commercial District.

62.     The Haight Street Neighborhood Commercial District zoning requirements does permit Homeless Shelters. San Francisco Planning Code Sec. § 719.

63.     Nothing in the Haight Street Neighborhood Commercial District zoning requirements permits a homeless camp. San Francisco Planning Code Sec. § 719.

64.     A homeless camp cannot be considered a homeless shelter as it does not meet the provisions set forth in the Administrative Code for the operation of a Homeless Shelter. San Francisco Administrative Code Art. XIII Sec. 20.400 *et al*.

65.     The San Francisco Planning Code Sec. § 703 requires that all "permitted uses shall be conducted within an enclosed building in Neighborhood Commercial Districts …".

66.     The proposed homeless camp is not going to be operated within an enclosed building as required by code.

67.     Upon information and belief, Defendant purchased 730 Stanyan Street for $15,500,000 on April 10, 2018.

68.     Upon information and belief, the City of San Francisco has not obtained a variance to the zoning codes to allow it operate a homeless camp outside an enclosed building as required by the Planning Code.

69.     Upon information and belief, the City of San Francisco has not issued an urgency measure passed with a four-fifths vote by the city council regarding the property it owns at 730 Stanyan Street.

**Irreparable and Long-Term Harm Will Result If the City Is Allowed to Proceed**

70.     As discussed above, if the City is allowed to unsafely house a large number of people in a small space in the middle of a densely-populated residential and business district, without working toilets and potentially also without the running water necessary for proper sanitation, during the COVID crisis, the result will be a high risk of transmission of COVID19 among the Campers and among the residents, merchants, and property owners of the surrounding area. In addition, an increase in crime and open-air drug use is a virtual certainty; indeed, this is a familiar pattern that has played out under similar circumstances in the Tenderloin, as well as at the very site of the Safe Sleeping Village a mere 5 years ago.

71.     CCOH members include residents who live within the Commercial Corridors area – some, for many years – and who are in close proximity to 730 Stanyan Street. These residents have grave concerns for their health and well-being, should the Safe Sleeping Village be opened.

72.     One such member lives on Masonic Avenue and Haight Street, and has been a resident for 20 years. As a 2-year cancer survivor still on hormone suppressant therapy and suffering ongoing secondary conditions from high blood pressure, she is particularly vulnerable to COVID19 and has been sheltering at home since March 18, 2020. She has left her home only once for oncology lab work, and for a chest X-ray for an ongoing cough. Because she is considered high risk, the introduction into her neighborhood of a tent encampment raises and exacerbates serious health concerns. With the existing tents that scatter the intersection of Haight Street and Masonic Street, she has already observed feces and urine on the sidewalks, drug abuse, screaming at all hours of the night, aggressive threatening behavior toward the police and his fellow neighbors, and she reasonably anticipates a significant increase in this activity should 730 Stanyan Street open the encampment. She will be fearful of leaving her house if the Safe Sleeping Village is opened.

73.     Another member lives on Waller Street, directly next to the 730 Stanyan Street lot, with his wife and two young children, 4 years and 6 months old. Their kitchen faces the site, and their two bedroom windows are 10 feet from where the first tents will be, separated only by a see-through wooden fence. They witnessed the violence, drug use, property damage, crime, accumulation of

garbage, and constant noise and smell that was present when 730 Stanyan Street was occupied by the McDonald's, and they fear that their family's health, safety, and well-being will be threatened by similar conditions should the encampment be opened. Given that 730 Stanyan Street is located next door to this member's house, he and his family need to pass the lot in order to travel to obtain groceries, take their children to the park, or run essential errands. He is very concerned that he and his family will be at significant risk of contracting COVID19 and/or of being victims of a crime if they leave their residence for any purpose, after the opening of the Safe Sleeping Village. They are also witnesses to the fact that 30-50 children (between 18 months and 4 years old) are dropped off by their parents each morning at the "Tinker" pre-school at 1757 Waller Street, which is less than 100 feet away from 730 Stanyan Street. They observe that around 10:30 a.m. each morning, the pre-school teachers take the children to Golden Gate Park in groups of 10, and they walk down Waller Street, take a right on Stanyan Street, and cross into the park at Whole Foods. This member is very concerned that the Safe Sleeping Village will pose health, safety, and security risks for the pre-school children in his community.

74.     Another member lives on Stanyan Street within 1 block of 730 Stanyan Street. She is a resident, property owner, and a mother of three young children, ages 8, 7, and 4. She is also the owner of a business located within one block of Stanyan Street, and is a member of the Haight Ashbury Nursery Pre-School. She is extremely concerned about the health and safety issues posed by the encampment, particularly the risks it will bring to the children and families of the community. Her family walks past 730 Stanyan Street at least three times a day, including to go to the pre-school, and she is aware that the same is true for many other families.

75.     Another member lives on Stanyan Street and Frederick Street, approximately 3 blocks from 730 Stanyan. As a parent to a toddler and a newborn, she is extremely concerned that her family's health and safety will be threatened by the proposed encampment. Her family shops for groceries at Whole Foods multiple times per week, and also frequents Golden Gate Park, both of which require that she pass in close proximity to 730 Stanyan Street. While her family normally visits Koret playground and carousel to get fresh air, they have been unable to do so during shelter in place, and as such they are even more reliant on visiting Golden Gate Park, and they go there at least once a day with their kids. She is gravely concerned that once the Safe Sleeping Village opens, she will have no choice but to be exposed to drug use, violence, and/or lack of social distancing, multiple times a

day, simply by virtue of leaving her house. She feels especially vulnerable, as it is not easy to react to a threat with a child in one hand and a stroller in the other.

76.     Two other members are a married couple, each 70 years old, who live on Haight Street between Ashbury Street and Masonic Avenue, a few blocks from 730 Stanyan Street. They are residents, merchants, and property owners. Their residence is above their business location on Haight Street, and they are also the landlords of their building. While they have done business in San Francisco since 1972, and have been merchants on Haight Street since 1981, their livelihoods have never been so impacted as with the COVID19 pandemic. They have been forced to board up their store against crime while their store has been closed during the pandemic, due to the windows repeatedly being broken. They are doing their best to keep their two tenants by offering them reduced rent. Their businesses are hanging on by a thread. The significant health and safety threats posed by the opening of the Safe Sleeping Village will likely put them out of business. Should the Safe Sleeping Village be opened, these members are fearful for the health, safety, and well-being of themselves, their tenants, and their customers (should their business ever reopen), all of whom will be at heightened risk of contracting COVID19 and/or of being the victims of crime, including because many of them will need to pass directly by 730 Stanyan Street to travel to his store.

77.     Another member lives at Haight Street and Masonic Avenue, where there is already an informal tent encampment. She has observed within the tent encampment a lack of social distancing, lack of mask-wearing, coughing without covering of mouths, spitting on the sidewalk, and other health hazards among the campers. She has also observed crime, including physical assaults involving dragging tents and inhabitants down the street in the middle of the night, as well as open alcohol consumption and a number of drug overdoses. Out of fear for her safety and health, she has had to keep her windows closed at all times and is reticent to leave her residence, even for basic needs.

78.     In addition to these imminent threats to physical health and safety, the opening of the Safe Sleeping Village will pose an existential risk to the viability of local businesses owned or operated by CCOH members, both immediately and in the long term. Most of these businesses depend on foot traffic and regular, repeat customers for survival. Yet following the City's announcement of the Safe Sleeping Village, many such customers have ceased any shopping in the Commercial Corridors, have replaced their regular vendors with merchants located far away from 730 Stanyan Street, and have no intentions of returning to the Commercial Corridors to patronize its businesses.

This decision is understandable: customers have chosen not to assume the risks of infection or other physical danger that will be posed by shopping in the immediate vicinity of the Safe Sleeping Village.

79.     As but one example, a CCOH merchant who runs a music store located next door to 730 Stanyan Street received a letter from a customer a mere four days after the City's announcement of the Safe Sleeping Village. In the letter, the customer lamented the fact that although he and his wife had been regular patrons of Haight Street vendors, "after this tent site, we'll be avoiding the area altogether and shopping for groceries at Trader Joe's on Masonic or Whole Foods on Market." This customer added "[w]e've heard the same from all our neighbors."

80.     Another CCOH merchant is a managing member of the ownership of the Whole Foods Market across from 730 Stanyan Street, along with being a resident who lives a few blocks from 730 Stanyan Street. He is gravely concerned that he and his employees will be at heightened risk of contracting COVD19 and/or of being the victims of crime, should the Safe Sleeping Village be opened, including because many such people will need to pass directly by 730 Stanyan Street to travel to Whole Foods Market.

81.     Another CCOH merchant, who operates a pizza restaurant one block from 730 Stanyan Street, has been conducting "curbside" business as permitted during the City's shelter-in-place orders. Such business depends, in significant part, on foot traffic on Haight Street. The opening of the homeless encampment at 730 Stanyan Street poses an existential risk to the viability of his business, both immediately and in the long term. Since the City's announcement of the Safe Sleeping Village, many of his regular customers have ceased coming to Haight Street for their shopping and dining needs. This merchant reasonably fears that the customers will have no intention of ever returning to Haight Street to patronize its businesses, given the increased risks of infection or other physical danger that will be posed by shopping in the immediate vicinity of the Safe Sleeping Village. Moreover, this merchant is gravely concerned that him, his employees, and his customers will be at heightened risk of contracting COVID19 and/or of being the victims of crime, should the Safe Sleeping Village be opened, including because many of them will need to pass directly by 730 Stanyan Street to travel to his store. Some of his employees use the bus to travel to work, and the bus stop is located within 10 feet of 730 Stanyan Street.

82.     Should the opening of 730 Stanyan Street result in sidewalk conditions that impose physical barriers to safe access – as has occurred in the Tenderloin due to the City's mismanagement

of the pandemic with regards to the homeless population[18] – the businesses of Haight Street will be even further burdened, as customers will understandably avoid the need to press through crowded sidewalks during a pandemic in order to patronize their usual stores.

83. CCOH seeks an injunction against the opening of the Safe Sleeping Village at 730 Stanyan Street. CCOH makes the factual allegations and asserts the legal claims herein in an effort to compel the City to comply with its obligations under the law, and to protect the health, safety, financial integrity, and general well-being of the Haight Street community and of the Campers who will soon be subject to unsafe living conditions, should injunctive relief not issue.

84. As Plaintiff seeks no monetary damages, but only equitable and injunctive relief, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code §814.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**

**Violation of the Due Process Clause**

**(42 U.S.C. § 1983 & U.S. Const. Amend. XIV)**

*(By Plaintiff on behalf of its members against Defendant)*

85. Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

86. Defendant, and its employees, acting under color of state law, have, or intend to establish imminently, a homeless encampment at or near the corner of Haight Street and Stanyan Street in San Francisco, California, with deliberate indifference and reckless disregard to known and obvious dangers such an encampment poses to Plaintiffs' members, which dangers include, but are not limited to, the following:

  a. an increased risk of transmission of COVID19 among the homeless residents of the encampment and surrounding community;

  b. the rendering of sidewalks as impassible or otherwise inaccessible, including during emergencies;

---

[18] *See, e.g. Hastings College of the Law v. City and County of San Francisco,* Case No. 3:20-cv-03033-JST (N.D.C.A. May 4, 2020).

c.  the attendant crime and drug use.

87.     Defendant, and its employees, have also denied Plaintiff's members unimpeded liberty and use of their property, and have or will imminently cause unsafe conditions to arise that threaten the health and lives of Plaintiff's members, as guaranteed by the Fourteenth Amendment of the United States Constitution.

88.     As a foreseeable result of the affirmative actions of Defendant and its employees, Plaintiff's members have or will imminently become exposed to these actual and particularized dangers, which threaten the liberty, property, and lives of Plaintiff's members.

89.     Defendant is liable for the actions of its employees under *Monell v. New York Dept. Soc. Servs.*, 436 U.S. 658 (2978), because (1) its employees acted pursuant to a formal decision or policy adopted by Defendant; (2) its employees acted in accordance with Defendant's longstanding policy or custom; (3) it failed to adequately supervise or train its employees; (4) the person or persons responsible for deciding to establish the homeless encampment acted in his or her capacity as a final policymaker for Defendant; and/or (5) the City, by and through its final policymaker(s), ratified the decisions of subordinates to establish the encampment by failing to prevent the establishment of the encampment despite Plaintiff's request to do so.

90.     Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendant is enjoined from establishing or maintaining an unsafe homeless encampment at 730 Stanyan Street.

91.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiff is entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief prohibiting Defendant from establishing or maintaining an unsafe homeless encampment at or near the corner of Haight Street and Stanyan Street.

92.     Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

## SECOND CLAIM FOR RELIEF

### Negligence

*(By Plaintiff on behalf of its members against Defendant)*

93.     Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

94.     Defendant, by and through its agents and employees, has the sole right and responsibility to control, maintain, and keep safe and clean the public and public-right-of-way areas in San Francisco, including parks, sidewalks, streets, and public buildings, and to make and enforce laws assuring the public health and safety thereof for its citizens and their guests. Among other things, Defendant has the duty to maintain these areas in a manner that does not unreasonably interfere with the free passage or use by Plaintiff's members and that addresses and alleviates conditions that are harmful to health or indecent or offensive to the senses, that create a fire hazard, or that permit crime to occur unabated including the illegal sale of controlled substances.

95.     As controlling law makes clear, "[t]he public is entitled to the free and unobstructed use of the entire streets and sidewalks…." *Vanderhurst v. Tholcke*, 113 Cal. 147, 152 (1896). Indeed, municipalities "have the duty to keep their communities' streets open and available for movement of people and property, the primary purpose to which the streets are dedicated." *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 160 (1939).

96.     Defendant and its agents have breached their duty to Plaintiff's members whom have suffered or will imminently suffer as a result. The bases of this claim for relief include the conduct, acts, and omissions of individual City officials and agents, based on the theory of *respondeat superior*.

97.     Plaintiff does not seek monetary damages hereunder and submits this claim for only equitable and injunctive relief. Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

98.     Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

---

Complaint                                                                    21                                                                    Case No.

### THIRD CLAIM FOR RELIEF

### Public Nuisance

### (Cal. Civ. Code §§ 3490, *et seq.*)

(*By Plaintiff on behalf of its members against Defendant*)

99.     Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

100.    California has defined nuisance as:

> [a]nything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance.

Cal. Civ. Code § 3479.

101.     That statute "is an expression of the Legislature's public policy against public nuisances, and it is plainly aimed at protecting the public from the hazards created by public nuisances." *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 136 (2017). In addition to health and safety hazards, "[a] reduction in property values caused by activities on a neighboring piece of land, and an assault on the senses by noise, dust, and odors, are just the kinds of harm that common law suits to abate a nuisance are designed to redress." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 101 F.3d 503, 505 (7th Cir. 1996). A public nuisance is the substantial and unreasonable interference with a public right. *San Diego Gas & Elec. Co. v. Superior Court*, 13 Cal. 4th 893, 938 (1996).

102.    As described above, the City, by its failure to maintain the public property under its control and to enforce the laws requiring the same, is perpetuating and facilitating a public nuisance.

103.    Plaintiff and its members have or will imminently experience a substantial and unreasonable interference with the enjoyment of their property, whether that be a building owned or a

room rented, and with their right of free passage and use; each has suffered and continues to be threatened with respect to his, her, or its health and welfare, by reason of the increased threat of disease and the experience of human waste, trash, tents, and encampments outside his, her, or its property and along and on the sidewalks and streets.

104. Plaintiff and its members have or will imminently become damaged in his, her, or its own right, in a manner especially injurious to himself, herself, or itself. Neither Plaintiff nor its members consented to Defendant's conduct.

105. Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

**FOURTH CLAIM FOR RELIEF**

**Private Nuisance**

**(Cal. Civ. Code §§ 3501, *et seq.*)**

(*By Plaintiff on behalf of its members against Defendant*)

106. Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

107. Several of Plaintiff's members own, lease, occupy, or otherwise control all of a portion of a home or business at or near the new homeless encampment. By Defendant's actions and inactions, each has created a condition or permitted a condition to exist that is harmful to the health, is indecent and offensive to the senses, obstructs the free passage and use of public parks, squares, streets, highway, and sidewalks, permits unlawful sales of illicit narcotics, and/or constitutes a fire hazard, as described above.

108. Defendant's conduct has been and is intentional and unreasonable, or unintentional but negligent or reckless. Alternatively, the condition permitted to exist was the result of abnormally dangerous activity that substantially interfered with, or will interfere with imminently, Plaintiff's member's use or enjoyment of his, her, or its land that would reasonably annoy or disturb an ordinary person. Neither Plaintiff nor its members have consented to Defendant's conduct; they are harmed;

Defendant's conduct was a substantial factor in causing the harm; and the seriousness of the harm outweighs any public benefit of such conduct (which is none).

109.    Plaintiff does not seek monetary damages hereunder and submits this claim for only equitable and injunctive relief. Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

110.    Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

## FIFTH CLAIM FOR RELIEF

### Violation of Mandatory Duty

### (Cal. Gov't Code § 815.6; Cal. Welf. & Inst. Code § 17000)

*(By Plaintiff on behalf of its members against Defendant)*

111.    Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

112.    Defendant is liable under Cal. Gov't Code § 815.6 and common law negligence theory for violation of a statutorily mandated duty to provide medical care for the indigent. Cal. Welf. & Inst. Code § 17000 provides:

> Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

113.    Cal. Welf. & Inst. Code § 10000 clarifies and defines the purpose of these obligations as follows:

> The purpose of this division is to provide for protection, care, and assistance to the people of the state in need thereof, and to promote the welfare and happiness of all of the people of the state by providing appropriate aid and services to all of its needy and distressed. It is the legislative intent that aid

Complaint                                        24                                        Case No.

shall be administered and services provided promptly and humanely, with
due regard for the preservation of family life, and without discrimination on
account of ancestry, marital status, political affiliation, or any characteristic
listed or defined in Section 11135 of the Government Code. That aid shall
be so administered and services so provided, to the extent not in conflict
with federal law, as to encourage self-respect, self-reliance, and the desire
to be a good citizen, useful to society.

114.    Sections 17000 and 10000 taken together mandate that "medical care be provided to indigents . . . promptly and humanely." *Tailfeather v. Board of Supervisors*, 48 Cal. App. 4th 1223, 1245 (1996). This means that cities and counties must provide medical care to the poor "at a level which does not lead to unnecessary suffering or endanger life and health." *Id.* at 1240. The California Supreme Court has held that municipalities must provide "subsistence medical services." *Hunt v. Superior Court*, 21 Cal. 4th 984, 1014 (1999) ("Section 10000 imposes a minimum standard of care—one requiring that subsistence medical services be provided promptly and humanely."). Cities and counties have an obligation to provide "'medically necessary' care, not just emergency care." *County of Alameda v. State Bd. of Control*, 14 Cal. App. 4th 1096, 1108 (1993) (*quoting Bay Gen. Cmty. Hosp. v. County of San Diego*, 156 Cal. App. 3d 944, 957 (1984)). Importantly, a city or county's obligation to provide medically necessary care must be fulfilled "without regard to its fiscal plight." *Id.* "Medically necessary" for adults is defined by statute: "[A] service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain." Cal. Welf. & Inst. Code § 14059.5(a).

115.    In view of the above-described facts and circumstances, and the statistics and reports including those set forth above, and other such evidence as may be provided, a person's status as an unsheltered homeless individual both causes and exacerbates physical and mental health problems, ultimately causing much higher rates of infection, disease, decay, pain, and death.

116.    Basic shelter is "medically necessary" because it is "reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain," and the

City's failure to provide the same to its homeless population constitutes a breach of its duty under Cal. Welf. & Inst. Code §§ 17000 & 10000.

117.     Plaintiff's members have been damaged by the City's failure to provide adequate, safe shelter, as described in detail above.

118.     Plaintiff does not seek monetary damages hereunder and submits this claim for only equitable and injunctive relief. Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

119.     Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

## SIXTH CLAIM FOR RELIEF

### Violation of Cal. Constitution Art. I, § 1.

(*By Plaintiff on behalf of its members against Defendant*)

120.     Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

121.     California Constitution, article I § 1 provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

122.     The actions by the City have limited, damaged, and/or burdened Plaintiff's members' constitutionally guaranteed inalienable rights, including their rights to enjoy and defend their life and liberty; to acquire, possess, and protect their property; and to pursue and obtain safety, happiness, and privacy.

123.     Plaintiff does not seek monetary damages hereunder and submits this claim for only equitable and injunctive relief. Accordingly, the City is not entitled to any claim of immunity, pursuant to Cal. Gov't Code § 814.

124.    Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

**SEVENTH CLAIM FOR RELIEF**

**Violation of San Francisco Planning Code Art. 7, Sec. 703**

(*By Plaintiff on behalf of its members against Defendant*)

125.    Plaintiff incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

126.    730 Stanyan Street is owned by the Defendant.

127.    730 Stanyan Street is not zoned for a homeless encampment.

128.    Defendant has not obtained a variance as is required by law to run a homeless camp contrary to the Planning Code.

129.    Plaintiff and its members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendant is enjoined from establishing or maintaining an unsafe homeless encampment at 730 Stanyan Street.

130.    Plaintiff found it necessary to engage the services of private counsel to vindicate its members' rights under the law. Plaintiff is therefore entitled to an award of attorneys' fees pursuant to Cal. Civ. Code § 52.1 and Cal. Code Civ. Pro § 1021.5.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against Defendant as follows:

A.    An order and judgment declaring that the Defendant' planned or actual homeless encampment at 730 Stanyan Street near the corner of Haight Street and Stanyan Street in San Francisco, California has or will be constructed or maintained in a manner that violates the Fourteenth Amendments to the U.S. Constitution and/or zoning laws;

B.    An order maintaining the *status quo* and temporarily, preliminarily, and permanently enjoining and prohibiting Defendant from establishing or maintaining a homeless encampment at 730

Stanyan Street near the corner of Haight Street and Stanyan Street in San Francisco, California, or as may otherwise be determined by law;

      C.     For attorneys' fees and costs;

      D.     Such other and further relief as the Court deems appropriate and just.

Date: May 26, 2020              DHILLON LAW GROUP INC.

           By: /s/ Harmeet K. Dhillon
                HARMEET K. DHILLON (SBN: 207873)
                harmeet@dhillonlaw.com
                MARK MEUSER (SBN: 231335)
                mmeuser@dhillonlaw.com
                GREGORY R. MICHAEL (SBN: 306814)
                gmichael@dhillonlaw.com
                DHILLON LAW GROUP INC.
                177 Post Street, Suite 700
                San Francisco, California 94108
                Telephone: (415) 433-1700
                *Attorneys for Plaintiff Concerned Citizens of the Haight*